

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MARIA R. CORREA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 05 C 3791 |
| | ) |
| THE ILLINOIS DEPARTMENT OF | ) Judge John W. Darrah |
| CORRECTIONS and | ) |
| AL WHITE, individually, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Maria R. Correa, filed suit against Defendants, alleging sex discrimination, sexual harassment, and racial discrimination. Presently pending before the Court is Defendants' Motion for Summary Judgment.

### LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts or by merely resting on its pleadings. *See Hemsworth, II v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (*Hemsworth*); *Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001). Instead, the party that bears the burden of proof on an issue must affirmatively demonstrate, by specific factual allegations, that a genuine issue of material fact exists that requires a trial. *See Hemsworth*, 476 F.3d at 490.

Local Rule 56.1(b)(3)(c) allows the opposing party to file "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting material relied upon." L.R. 56.1(b)(3)(c). The Court is entitled to strict compliance with Rule 56.1. *See Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (*Ammons*). The references and citation to the parts of the record in support of a party's response to the movant's proposed statement of facts and/or additional statement of fact must include a specific reference to the record that supports that response or additional statement. Citations to entire deposition transcripts or lengthy exhibits are not sufficient. *See Ammons*, 368 F.3d at 817-18. The District Court is not obligated to review the record for facts that the party could have easily identified with greater particularity. *See Ammons*, 368 F.3d at 818. Furthermore, allegations from the plaintiff's complaint are not admissible evidence to defeat summary judgment. *See Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006).

In the instant case, Correa has submitted seventy statements of additional facts in opposition to Defendants' Motion for Summary Judgment. The reference and citations to many of these statements consist of citations, in their entirety, to Correa's Second Amended Complaint, Correa's (243-page) Deposition, and/or Correa's (21-page) Answer to Defendants' Interrogatories. Correa

2

also merely cites "Id," referring back to these same overly broad citations in several proposed statement of additional facts. Several proposed additional statements of fact also include the citation of "Id"; but the previous citation fails to support the proposed statement of fact. Those additional statements of fact proposed by Correa that are supported by proper citation and by the materials cited therein are included in the following undisputed facts; the proposed statements of additional facts that fail to comply with L.R. 56.1(b)(3)(c) are not included in the following undisputed facts.

## FACTS

Correa, a Hispanic female, began her employment with the Illinois Department of Corrections ("IDOC") in 2001. Beginning August 1, 2002, she was employed at the Fox Valley Adult Transition Center ("Fox Valley ATC") as an Executive Secretary I. As Executive Secretary I, one of Correa's assignments was the volunteer coordinator of the facility. (Def.s' 56.1(a)(3) Statement ¶ 5). Correa was the only Hispanic employee at the Fox Valley ATC. (Id., ¶ 6). Albert White has been employed by the IDOC since 1983. He began working at the Fox Valley ATC as the Center Supervisor in January 2003. In that capacity, he was Correa's immediate supervisor. (Id., ¶ 3). The Fox Valley ATC is a work-release facility for adult female felons located in Aurora, Illinois, and was established to transition female inmates or "residents" back into society. The inmates are still serving out their sentences and are considered to be in the custody of the IDOC. A majority of the inmates are recovering drug and alcohol addicts who were originally sent to prison for drug-and alcohol-related convictions. (Id., ¶ 4).

White's responsibilities included determining which programs – such as AIDS education, parenting skills, and recreational activities – to offer to the residents within the guidelines and the mission of the facility and within budgetary constraints. (Def.s' 56.1(a)(3) Statement ¶ 22). As

3

Correa's direct supervisor, White had the authority to ensure that Correa was meeting deadlines on the assignments he gave to her, to check on the quality of her work and to ask Correa what she was doing during the day and where she was going during the day. White could make adjustments to Correa's job duties either at her request or based on the needs of the facility. (Id., ¶ 23).

Mohammad Rashid, an Indian, has been an office assistant with the IDOC at the Fox Valley ATC since February 1998. As an office assistant, Rashid was assigned to perform clerical functions. (Def.s' 56.1(a)(3) Statement ¶ 7). Debbie Denning, a Caucasian, is the Deputy Director of Women and Family Services for the IDOC since May 2003. As Deputy Director, Denning is White's immediate supervisor. (Id., ¶ 8). Salvador Godinez, a Mexican-American male, held the title of Chief of Operations from November 10, 2003 until his resignation from the IDOC on June 19, 2006. On January 25, 2005, he was promoted to the title of Chief of Staff while concurrently maintaining his duties as Chief of Operations. Throughout November 2003 until June 2006, Godinez was Denning's immediate supervisor. (Id., ¶ 9).

Correctional Residence Counselors (CRCs) are security personnel at the Fox Valley ATC. CRCs are responsible for maintaining security of the facility. A CRC can hold the title of CRC One ("CRC I") or CRC Two ("CRC II"), depending upon their seniority. CRCs are also assigned one or two administrative functions at the facility. (Def.s' 56.1(a)(3) Statement ¶ 10). Some of the CRCs that worked during the same time as Correa include: Janet Barnes, CRC I, Caucasian female; Derrick Hill, CRC I, African-American male; Patrick Thwaites, CRC I, Caucasian male; Rebecca Carson, CRC II, African-American female; Anita Christoffel, CRC II, Caucasian female;

4

James Hersheway, CRC II, Caucasian male; Candice Larson, CRC II, Caucasian female; Thomas Lloyd, CRC II, African-American male; Erica Pierre, CRC II, African-American female; and Janet Urban, CRC II, Caucasian female. (Id., ¶ 11).

Correctional Counselors ("CC") coordinate case-management services, such as assessing the needs of the residents and monitoring the residents' transition at the center. During Correa's tenure at the Fox Valley ATC, Gary Puckett, a Caucasian male, and Carla Sager, a Caucasian female, held the title of CC. CCs are not considered security staff. (Def.s' 56.1(a)(3) Statement ¶ 12).

Administrative Directives, the IDOC Department Regulations, Fox Valley's ATC's Employee Handbook, and the Union Contract governed Correa's employment with the IDOC. (Def.s' 56.1(a)(3) Statement ¶ 13). Each employee is responsible to account for their available benefit time, including sick days, compensatory time, vacation days, and personal days. An employee earns their allotted vacation day(s), depending on their length of service, on the last day of each month. Employees earn one sick day at the first of every month. (Id., ¶ 14). In order to utilize accrued benefit time, an employee must submit for approval a Notification of Absence ("NOA") slip to his or her supervisor. NOA slips are used by an employee to request time off and to designate which benefit time the employee seeks to use for their time off. (Id., ¶ 15).

As to each individual offense or type or classification of offense, the progressive discipline policy in effect at the time of Correa's employment was an oral warning, then a five-day suspension, a seven-day suspension, a fifteen-day suspension, a thirty-day suspension, and then suspension pending discharge. (Plaint.'s 56.1(b)(3) Statement ¶ 28).

5

The IDOC has an affirmative attendance policy, which imposes progressive discipline to employees who violate the policy. (Def.s' 56.1(a)(3) Statement ¶ 17). If the IDOC must issue a written discipline against an employee for a violation of the affirmative attendance policy or any other Administrative Directive or the IDOC Regulation, typically the employee's supervisor, although it can be someone higher in the chain of command, will issue an employee-review hearing notification. An oral reprimand may be issued without an employee-review hearing, but the employee is entitled to union representation at the time the oral reprimand is issued. (Id., ¶ 18). At the employee-review hearing, a member of another facility's management staff is appointed as a third-party hearing officer. The hearing officer, and not the employee's supervisor, determines if discipline should be imposed. Once a decision is made to discipline an employee, a letter or memo is given to the employee, notifying him or her of the final charges and the level of discipline he or she is going to receive. If the discipline sought to be imposed is greater than a thirty-day suspension, the matter is forwarded to the IDOC's Director, with guidance from the Labor Relations division, for approval. (Id., ¶ 20).

On December 30, 2004, White informed Correa and Rashid that they would no longer have private offices and that they would share an office in an area located just outside White's office, where he understood that the clerical staff of the facility worked under prior Center Supervisors. (Def.s' 56.1(a)(3) Statement ¶ 26). When he made the office move, White told Correa that she and he would be working very closely with each other, that they would be working closer and in closer proximity, or words to that effect. (Plaint.'s 56.1(b)(3) Statement ¶ 56). White also stated that they were now going to be joined at the hip and, because Correa is short, White would make himself short so that they could be attached at the hip, or words to that effect. (Id., ¶ 58). On or around this same

6

date and the beginning of January 2005, Correa lodged an internal complaint of sexual harassment against White. (Def.s' 56.1(a)(3) Statement ¶ 27). On behalf of the IDOC, Janet Richmond investigated Correa's allegations of sexual harassment, including interviewing Correa and White. Richmond ultimately found Correa's allegations were unfounded. (Id., ¶ 29).

Correa alleged that White created a hostile work environment and sexually harassed her by: (1) asking her if she would consider dating an African-American male; (2) asking her personal questions, such as inquiring into her upbringing, where she was raised, why she divorced, why she was alone during the holiday season, and that many of these questions started with "How was your weekend?; (3) walking into White's office on four or five occasions and seeing him adjusting his pants, after which he would state that he had to be "more careful about that"; (4) complimenting her outfit or inquiring whether her outfit was new; (5) complimenting other female staff members on their clothing; (6) White's receipt of a hotel's discount coupon in the mail; (7) on one occasion, calling Correa by her first name; (8) residents' asking Correa if she was dating White; (9) staff members' referring to Correa and White as "husband and wife" or "mom and dad," which upset Correa because she believed that comment meant that there was a perception of a personal relationship between Correa and White; (10) moving Correa's office closer to White's office; (11) attempting to hug Correa and asking her why she always hugged an African-American co-worker; and (12) driving around the facility in a van while a residents' program was holding a picnic outside. (Id., ¶ 29; Plaint.'s 56.1(B)(3) Statement ¶¶ 51, 53). White would also ask Correa who she was dating, what she thought of the person she was dating, and how she would feel about dating and/or would she consider dating an African-American male. (Plaint.'s 56.1(b)(3) Statement 10). Correa also observed a female co-worker come out of the men's restroom in 2005. White testified

that the female co-worker was in the restroom helping him with his tie. (Id., ¶ 54). Correa does not recall when White first started to harass her but that it was "ongoing." (Id., ¶ 47). After White would make comments to Correa, she would walk away, feeling that she needed to take a shower. (Id., ¶ 48). It got to a point where Correa "couldn't be in the same room with [White] anymore." (Id., ¶ 49).

Correa also claims that White instructed her not to speak Spanish to the inmates approximately three or four times throughout the time they worked together. White told Correa not to speak Spanish to the inmates because they understood English. (Def.s' 56.1(a)(3) Statement ¶ 31). There were no inmates at the Fox Valley ATC who did not speak English. (Id., ¶ 32).

White would not allow Correa to participate in planning Black History Month with Lloyd, who was assigned to handle the leisure activities for the facility. (Def.s' 56.1(a)(3) Statement ¶ 33). Additionally, Correa proposed additional ideas for celebrating Hispanic Heritage Month to White; but he denied her the ability to pay for those ideas with the inmates' activity funds. (Id., ¶ 34). White also asked Correa about her relationships with Hispanic legislatures, "to find out just how close of a relationship [she] had with them." (Id., ¶ 35). White, Carson, and Lloyd would also speak in Ebonics; but she was not a part of the conversation. (Id., ¶ 36). Correa also had conversations with White, wherein she would imply that he compared the racism that African-Americans have historically endured as not being as severe as the racism that Hispanics have endured. (Id., ¶ 37).

On September 10, 2004, Correa gave her keys to a resident in the facility so the inmate could remove an item from Correa's personal car. Correa was aware that there was a policy regarding security and key control. (Def.s' 56.1(a)(3) Statement ¶ 39). On September 11, 2004, White received a telephone call from Hill, who indicated that he believed Correa, during her non-working

8

hours, was conducting some sort of investigation with the inmates. White asked to speak with Correa and told her to leave the building. (Id., ¶ 41). Because Correa's job duties did not include interviewing inmates regarding matters at the facility, White instructed Correa not to conduct interviews with inmates and not to speak with inmates concerning security matters of the facility. (Id., ¶ 43). On or about September 14, 2004, Correa was given an oral reprimand from Denning as to her giving her keys to an inmate. (Id., ¶ 40).

In December 2004, Correa complained to Godinez of sexual harassment by White and filed a written complaint of sexual harassment by White in January 2005. (Plaint.'s 56.1(b)(3) ¶ 15). On February 10, 2005, Correa filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On March 31, 2005, the EEOC issued Correa a right-to-sue letter. (Id., ¶ 19). Shortly thereafter, White approached Correa, showed her a copy of the right-to-sue letter and stated that charge had been "trumped." (Id., ¶ 20).

On June 15, 2005, after an investigation was conducted into a previous arrest of Correa and her failure to report that arrest, Correa was referred for discipline. Correa was subsequently given an oral reprimand for violating the IDOC's rules and regulations. (Def.s' 56.1(a)(3) Statement ¶ 45).

On June 13, 2005, Correa was approved to take two hours of benefit time. Prior to the beginning of her shift, Correa contacted White to request the full day off from work. White told Correa that she could take the entire day off, provided that she had enough benefit time to cover her absence. (Def.s' 56.1(a)(3) Statement ¶ 48). That same day at about noon, Correa arrived at the facility; and White informed her that she did not have any available time to cover her absence. (Id., ¶ 49). The next day, Correa was referred for discipline for the unauthorized absence. Correa received a written reprimand for this unauthorized absence. (Id., ¶ 50).

9

On June 1, 2005, Correa contacted White to remind him that she had prior approval to take the day off from work. White denied that he gave her prior approval to take the day off and informed her that he expected her to report to work. Correa did not report to work that day. (Def.s' 56.1(a)(3) Statement ¶ 46). Based on her failure to report to work, Correa was referred for discipline on June 7, 2005. Correa was issued an oral reprimand for an unexcused absence. (Id., ¶ 47).

On Saturday, June 18, 2005, Correa was at the Fox Valley ATC, attending a volunteer event; at which time, she made copies of Rashid's time sheets and time-off requests. White instructed Correa to stop making copies of Rashid's papers and referred her for discipline for this infraction. (Def.s' 56.1(a)(3) Statement ¶ 51). On June 21, 2005, Correa contacted the facility, stating that she was sick and that she would be arriving late. Correa submitted a NOA slip for 2.25 hours of sick time, even though she had no sick time available. (Id., ¶ 53). On June 27, 2005, Correa was referred for discipline and was subsequently issued a written reprimand for photocopying her co-worker's time records and a second written reprimand for the improper NOA slip. (Id., ¶¶ 52-53).

On June 28, 2005, Correa called into work sick. Because Correa did not have any available sick time, she was referred for discipline and subsequently was issued a one-day paper suspension. (Def.s' 56.1(a)(3) Statement ¶ 54). Paper suspensions are utilized to adhere to the terms of the progressive discipline but to ensure no loss of income to the employee. During the days that an employee is issued a paper suspension, the employee is expected to report to work, thus resulting in no loss of income. (Id., ¶ 55). On June 29, 2005, Correa requested sick time, even though she did not have sick time available. On July 1, 2005, Correa was referred for discipline for an unauthorized absence and subsequently received a three-day paper suspension for this unauthorized absence. (Id., ¶ 56).

On August 11, 2005, Correa was observed in the smoking room of the Fax Valley ATC, having her hair braided by one of the inmates, which is a violation of the IDOC's directives regarding fraternization with inmates. On August 31, 2005, she was referred for discipline regarding this matter and was subsequently issued a one-day suspension. (Def.s' 56.1(a)(3) Statement ¶ 58). On September 19, 2005, Correa sent emails to staff and department heads, concerning the operations of the Fox Valley ATC. White believed the distribution of emails to be inappropriate and insubordinate. In October 2005, Correa received a three-day suspension for this infraction. (Id., ¶ 59).

On October 1, 2005, at approximately 12:10 a.m., Correa arrived at the Fox Valley ATC and spoke with Christoffel. Correa stated that she was "way drunk." Because of Correa's statement, Christoffel took Correa's car keys. (Def.s' 56.1(a)(3) Statement ¶ 61). Christoffel contacted White and told him that Correa was at the facility, intoxicated and speaking with inmates. White told Christoffel to isolate Correa in the security area and to remove any inmates from the area. He also instructed Christoffel to ask Correa for phone numbers of friends and/or relatives who could provide her a ride home. (Id., ¶ 62). Correa allowed Christoffel to contact her daughter and an individual named Dennis to see if either could pick her up at the facility; neither was able to pick Correa up at the facility. (Id., ¶ 63). Subsequently, White contacted the Aurora Police Department to have Correa escorted off the premises. (Id., ¶ 64).

An investigation regarding the October 1, 2005 incident was conducted by the Office of Investigations and Intelligence ("OII"). Pending the results of the investigation, Correa was placed on "'lock-out' status paid administrative leave," beginning on October 6, 2005. (Def.s' 56.1(a) (3) Statement ¶ 65). On November 15, 2005, A.C. Kinard, an OII investigator, issued his report that

11

found that Correa violated the Administrative Directive regarding standard of conduct. (Id., ¶ 66). Correa was then referred for discipline for a employee review hearing. Jeff Barger, a Warden at another facility, conducted the employee review hearing. (Id., ¶ 67). Barger concluded that Correa's actions showed a flagrant disregard for the IDOC Administrative Directives and that Correa's actions irreparably damaged her credibility with the inmates; therefore, Barger recommended that Correa be discharged from the IDOC. (Id., ¶ 68). On January 13, 2006, Correa was suspended pending discharge and ultimately discharged on January 31, 2006. (Id., ¶ 69).

White is not familiar with any other IDOC employee that came into their work facility during non-working hours while intoxicated and interacted with inmates and created a disturbance where they worked. (Def.s' 56.1(a)(3) Statement ¶ 70). In or around July 2005, Urban, a Caucasian female, was accused of violating the Administrative Directive for trafficking and trading because she was selling purses to inmates. (Id., ¶ 72). White required Urban to generate an incident report, in which she reported her conduct to White. It was Urban's first discipline for violating an Administrative Directive, and she received a written reprimand. (Id., ¶ 73). Urban was also given an oral reprimand for using the term "whore" in reference to an inmate. (Id., ¶ 74).

In September 2005, Sager, a Caucasian, contacted White while she was on vacation and asked for permission to bring her mother to the facility for a tour. (Def.'s 56.1(a)(3) Statement ¶ 75). White granted Sager permission to bring her mother to the facility during her off-hours and was not disciplined for doing so because she had permission. (Id., ¶ 76).

12

Erica Pierre, a Fox Valley ATC employee under White's supervision, was arrested for off-work conduct. White spoke with the Aurora Police, answering questions that they asked of him. White could not recall if Pierre was disciplined but believes that she was disciplined. (Plaint.'s 56.1(b)(3) Statement ¶ 43; White's Dep. 206-07).

## ANALYSIS

Defendants first argue that Correa's Title VII claims as to any discrete race or sex discrimination claims occurring after February 10, 2005, are barred because Correa's February 10, 2005 EEOC charge does not contain any allegations regarding conduct or discipline taken against Correa after that date and she did not amend her EEOC charge to include any of the post-February 10, 2005 conduct or discipline.

Title VII plaintiffs must initially bring a charge with the appropriate administrative body – *i.e.*, the EEOC – before pursuing a claim in federal court; and, thus, Title VII claims cannot be brought if they were not included in the plaintiff's EEOC complaint. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985) (*Babrocky*). An exception to this general rule, which allows a claim not included in the EEOC complaint to be pursued in federal court, exists when that subsequent claim is "reasonably related" to the claim that was included in the EEOC charge. *Babrocky*, 773 F.2d at 864. Any claim that was not included in the EEOC charge and is later alleged in a complaint must be similar or reasonably related to the allegations in the EEOC charge and must grow out of those allegations. *See McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 482-483 (7th Cir. 1996) (*McKenzie*); *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (*Cheek*). To be reasonably related, a factual relationship must exist between both claims; specifically, a claim in a Title VII plaintiff's complaint and an EEOC charge are reasonably

13

related when the subsequent claim can be reasonably expected to be developed from an investigation of the allegations in the EEOC charge. *See Cheek*, 31 F.3d at 500. Claims are not alike or reasonably related if the EEOC charge and the complaint do not describe the same conduct and implicate the same individuals. *See McKenzie*, 92 F.3d at 481.

Here, Correa's subsequent claims are reasonably related to her EEOC charge because they describe similar conduct and implicate the same individual, White. Furthermore, Correa's claims are brought under both Title VII and 42 U.S.C. § 1981. Because the standard for establishing discrimination under Title VII and Section 1981 are identical, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) ( *Humphries*), the merits of Correa's claims relating to post-February 10, 2005 conduct and discipline must be addressed as to Correa's Section 1981 claims, regardless of whether they are reasonably related to her EEOC charge.

### Race and Sex[1] Discrimination Claims

A plaintiff may prevail on her discrimination claim either through the "direct method" – showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*). The direct method of proving discrimination requires the introduction of direct or circumstantial evidence of discrimination. Direct evidence requires, essentially, an admission by the defendant that the action was based on a prohibited animus. *See Blise*, 409 F.3d at 866. Correa does not present direct evidence.

---

[1]Correa's sole argument as to her sexual discrimination claims is to her claims of sexual harassment/hostile work environment. The analysis as to Correa's race discrimination claim applies equally to any claim of sexual discrimination regarding the alleged adverse actions.

A plaintiff may also proceed under the direct method by constructing a "convincing mosaic" of circumstantial evidence that a jury could infer to be intentional discrimination. The circumstantial evidence must point directly to a discriminatory reason for the adverse action. *See Blise*, 409 F.3d at 866. Here, Correa argues that evidence that White discriminated against her because of her race included: (1) White's directing her not to speak Spanish with the inmates, (2) White's denial of using the inmates' activity funds to pay for Correa's proposed additional ideas for celebrating Hispanic Heritage Month, (3) White's comparison of racism that African-Americans have experienced to racism that Hispanics have experienced, and (4) her being the only Hispanic at the Fox Valley ATC.

The uncontested facts that Correa identifies as creating a convincing mosaic of circumstantial evidence do not point directly to a discriminatory reason for any of the alleged adverse actions. Correa concedes that all of the inmates spoke English and that White had the responsibility of determining which programs were to be offered within the guidelines and mission of the facility and budgetary restraints. In addition, Correa's argument that because she was the only Hispanic employee, statistically, discrimination can be inferred is without merit. While Correa may have been the only Hispanic employee, she has not presented any facts by way of a statistical analysis that discrimination can be inferred based on the number of Hispanics employed at the Fox Valley ATC. *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 363 (7th Cir. 2001) (based on evidence of a trained statistician, judge decides whether such evidence is of the particular significance level to be admissible); *Bell v. EPA*, 232 F.3d 546, 553 (7th Cir. 2000) (valid statistical analysis must encompass the relevant labor market). Furthermore, Correa has failed to demonstrate that White's above conduct was related in any manner to the alleged adverse actions (whether the actions constitute an "adverse action" is discussed below).

15

Nor has Correa indirectly demonstrated race discrimination. To establish a *prima facie* case of race discrimination under the *McDonnell Douglas* framework, Correa is required to demonstrate that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001). If Correa demonstrates a *prima facie* case, the burden shifts to the Defendants to demonstrate "a legitimate, nondiscriminatory reason for the action." *Blise*, 409 F.3d at 867. If Defendants meet this burden, the burden shifts back to Correa to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

Correa is a member of a protected class. Correa identifies several disciplinary actions taken against her as adverse actions. An adverse action must be materially adverse, one that significantly alters the terms and conditions of the employee's job. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (*Griffin*). Actions such as harder work assignments, additional job responsibilities, unfair reprimands, and oral and written reprimands do not constitute an adverse action. *See Griffin*, 356 F.3d at 829 (collecting cases). However, an unpaid suspension and termination do constitute an adverse action. *See Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). The oral and written reprimands and paper suspensions that Correa received do not constitute an adverse action. *See Griffin*, 356 F.3d at 829. Correa's one-day, three-day, and termination do constitute adverse actions.

Correa has also failed to demonstrate she was meeting her employer's legitimate performance expectations at the time these actions were carried out. Correa received a one-day suspension after she was observed in the smoking room of the Fox Valley ATC, having her hair braided by an inmate,

16

in violation of the IDOC's directives against fraternization with inmates. Correa received a three-day suspension after she sent an inappropriate e-mail to staff and department heads, concerning the operations of the Fox Valley ATC. Lastly, Correa's employment was terminated after she came to the Fox Valley ATC, off-duty, when she was, by her own words, "way drunk." Correa's conduct that resulted in the two suspensions and termination all occurred within a two-month time frame and also took place while Correa was being disciplined for on-going attendance issues. These undisputed facts demonstrate that Correa was not meeting the IDOC's legitimate performance expectations.

Lastly, as to the *prima facie* case, Correa has failed to identify similarly situated employees that were not in the protected class that were treated more favorably. A plaintiff demonstrates that another employee is "similarly situated" to her by "show[ing] that there is someone who is directly comparable to [her] in all material aspects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A court must look at all relevant factors, the number of which depends on the specific case, when making this determination. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (*Radue*). In disciplinary cases in which the plaintiff alleges that she was disciplined more harshly than a similarly situated employee, the plaintiff must show that she is similarly situated with respect to performance, qualifications, and conduct. *See Radue*, 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18.

Specifically, as to Correa's suspensions, Correa has failed to present a similarly situated employee that engaged in similar conduct that was less harshly disciplined. Likewise, as to her termination, Correa argues, supported only with mere conclusions, that other IDOC employees came to work intoxicated but were not terminated. Correa does not identify who these IDOC employees are, the circumstances surrounding their actions, and whether any of these employees worked at the Fox Valley ATC or reported to White. Accordingly, Correa has failed to show that other similarly situated employees not in the protected class were treated more favorably; and she has failed to establish a *prima facie* case of discrimination.

Assuming argumendo, that Correa had presented a *prima facie* case, she has failed to demonstrate that Defendants' proffered reasons for suspending her and terminating her employment were a pretext to discrimination.

To demonstrate pretext, a plaintiff must show that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995).

Correa relies on her same conclusory argument that she was the only employee terminated after coming to the facility intoxicated as evidence that Defendants' reasons for terminating her employment was merely pretext to discrimination. This conclusory argument fails to demonstrate that Defendants' reason for her termination (or suspensions) was a pretext to discrimination.

Based on the above, summary judgment is granted in Defendants' favor on Correa's race and sex discrimination claims.

18

## Retaliation Claim

Title VII also prohibits an employer from retaliating against an employee that has complained of unlawful practices. *See* 42 U.S.C. § 2000e-3(a). An employee may present either direct or indirect evidence of retaliation. *See Humphries*, 474 F.3d at 404. Under the direct method, a plaintiff must show: (1) she engaged in a statutorily protected activity, (2) she was subjected to an adverse employment action, and (3) there is a causal connection between the two events. *See Humphries*, 474 F.3d at 404.

Correa has established that she engaged in a statutorily protected activity and that she was suspended and that her employment was terminated. In support of her argument that there is a causal connection between her filing the EEOC charge and the adverse actions, Correa relies upon the timing of the disciplinary actions taken against her and her filing of the EEOC charge[2]. Other than the timing of the events, Correa provides no evidence of retaliatory motive. "Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). A plaintiff does not meet her burden under the direct method of proof of retaliation by presenting no evidence of retaliatory motive other than the timing of her termination. *See Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 758-59 (7th Cir. 2006) (*Burks*). Furthermore, several months passed between Correa's filing her EEOC charge and

---

[2]Correa also cites to several of her proposed additional statements of fact that the Court previously struck because of lack of proper citation and/or support in support of her retaliation claim. These facts are not considered because they are not properly before the Court for the reasons stated above.

Correa's suspensions and termination. In addition, any speculation based on timing alone fails to support a reasonable inference of retaliation because the suspensions and termination are based on infractions that are undisputed.[3]

Under the indirect method, a *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate job expectations, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. Once the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Tomanovich v. City of Indianapolis*, 457 F.3d 657, 663 (7th Cir. 2006).

For the same reasons as discussed above as to Correa's race and sex discrimination claims, Correa's retaliation claim under the burden-shifting method also fails. Summary judgment is granted in Defendants' favor on Correa's retaliation claim.

## Sexual Harassment/Hostile-Work-Environment Claim

To establish a hostile-work-environment claim under Title VII, a plaintiff must demonstrate: (1) the workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment; (2) the harassment was based on plaintiff's sex; (3) the plaintiff

---

[3]Correa "disputes" that she was intoxicated when she went to the facility on October 1, 2005, but does not dispute that she told Christoffel that she was "way drunk."

perceived the work environment to be hostile or abusive; (4) a reasonable person would have perceived the work environment to be hostile or abusive; and (5) the employer knew or reasonably should have known that the plaintiff was being subjected to such treatment, and it did not take appropriate corrective action. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (7th Cir.1999).

For harassment to be actionable under Title VII, the employer's actions must be sufficiently severe or pervasive so as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 477 U.S. 57, 67 (1986). Title VII is not directed against unpleasantness *per se* but, rather, against discrimination in the conditions of employment. *Drake v. Minnesota Mining & Mfg. Co.*, 143 F.3d 878, 885 (7th Cir. 1998), quoting *Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir. 1994). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (*Harris*).

Correa alleges that the numerous actions/comments by White, taken together, constitute a hostile work environment. These actions include: (1) White's asking her if she would consider dating an African-American male; (2) White's asking her personal questions, such as inquiring into her upbringing, where she was raised, why she divorced, why she was alone during the holiday season, who she was dating, how she felt about the person she was dating, and other questions that started with "How was your weekend?"; (3) her walking into White's office on four or five occasions and seeing him adjusting his pants, after which he would state that he had to be "more careful about that"; (4) White's complimenting her outfit or inquiring whether her outfit was new; (5) White's

21

complimenting other female staff members on their clothing; (6) White's receipt of a hotel's discount coupon in the mail; (7) on one occasion, White's calling Correa by her first name; (8) inmates' asking Correa if she was dating White; (9) staff members' referring to Correa and White as "husband and wife" or "mom and dad," which upset Correa because she believed that comment meant that there was a perception of a personal relationship between Correa and White; (10) White's moving Correa's office closer to White's office; (11) White's attempting to hug Correa and asking her why she always hugged an African-American co-worker; (12) White's driving around the facility in a van while a residents' program was holding a picnic outside; and (13) Correa's observing a female co-worker come out of the men's restroom, in 2005, where the co-worker fixed White's tie. Other than the conclusory statements that this conduct was ongoing, Correa fails to identify times, dates, or places that White allegedly took these actions that Correa contends created a hostile work environment. However, conclusory statements not grounded in specific facts are insufficient to avoid summary judgment. *See Lucas v. Chicago Transit Authority*, 367 F.3d 714, 726 (7th Cir. 2004) (*Lucas*) (affirming summary judgment as to plaintiff's hostile-work-environment claim because plaintiff failed to present any specific times, dates or places which led to plaintiff's conclusions that work environment was hostile because African-Americans were treated "more harshly" – being asked to change rail ties more frequently, working longer sections of track, and being written up for reasons that non-African-Americans were not). With only these general conclusory statements, it is not possible to determine the frequency of the claimed discriminatory

conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with Correa's work performance. *See Harris*, 510 U.S. at 23; *Lucas*, 367 F.3d at 726. Accordingly, summary judgment is granted in Defendants' favor as to Correa's sexual harassment/hostile-work-environment claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

Dated: _October 17, 2007_

JOHN W. DARRAH
United States District Court Judge